**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **JUAN ESPINOSA and MAUREEN ROIG-ESPINOSA, his wife,** : | |
| : | |
| **Plaintiffs,** : | **01-CV-3655 (WJM)** |
| : | |
| **v.** : | **OPINION** |
| : | |
| **COUNTY OF UNION, *et al.*,** : | |
| : | |
| **Defendants.** : | |
| : | |
| : | |
| **COUNTY OF UNION, *et al.*,** : | |
| **Counterclaimants,** : | |
| **v.** : | |
| : | |
| **JUAN ESPINOSA and MAUREEN ROIG-ESPINOSA, his wife,** : | |
| : | |
| **Counterclaim-Defendant.** : | |

**MARTINI, DISTRICT JUDGE:**

**I) BACKGROUND**

Plaintiff Juan Espinosa has brought this action alleging a violation of his First and

Fourteenth Amendment rights, in addition to various state law claims[1], as a result of being

---

[1]Plaintiff's state law claims consist of: (1) Conscientious Employee Protection Act ("CEPA"), (2) aiding and abetting CEPA, (3) constructive discharge, (4) state constitutional tort, (5) breach of contract and implied covenant of good faith and fair dealing,(6) New Jersey public policy, (7) tortious interference with a prospective economic advantage, (8) intentional infliction of emotional distress, (9) defamation, and (10) fraud.

terminated from his position with the Union County jail.  Defendants filed three counterclaims, including (1) breach of the implied covenant of good faith and fair dealing, (2) conversion, and (3) unjust enrichment.

Plaintiff was employed by the Union County jail from 1982 to 1984 and again from 1988 to 2001.  (Defendants' Statement of Undisputed Fact ¶¶ 2-7; 147) (hereinafter "Def.'s SOF.") On June 18, 1995, plaintiff observed 25 to 30 fellow Union County correction officers beat, harass and abuse INS detainees that were transferred from the Esmor Detention Facility.  (*Id.* at ¶ 30.)  Plaintiff did not report the incident to anybody other than his superior Lieutenant Salay, who responded he "didn't care." [2]  (*Id.* at ¶ 52.)  In July 1995, the prosecutor's office contacted Espinosa for his assistance in conducting an investigation, to which he agreed to provide oral testimony before a grand jury upon issuance of a subpoena but refused to give a written statement.  (Plaintiff's Statement of Undisputed Fact ¶¶ 6-8) (hereinafter "Pl.'s SOF.")  During his first meeting with the prosecutor's office, Luitenant Durkin informed plaintiff he was aware of the Esmor incident and knew plaintiff had witnessed the event.  (Def.'s SOF ¶ 61.)  The prosecutor's office explained to Espinosa that all individuals who cooperated would be granted immunity.  Espinosa testified before the grand jury on August 9, 1995 and December 29, 1995. (*Id.* at ¶ 67; Hatfield Aff., Exh. G.)  He also wore a wiretap inside the jail to obtain additional evidence, had a tape recording machine installed in his home to record incriminating phone calls, and obtained documents from the jail.  (Pl. SOF ¶¶ 11-13.)  Twelve corrections officers were

_____

[2]Lt. Salay was charged with second degree official misconduct, for which he took a plea. (Def.'s SOF ¶ 57.)  Plaintiff conceded that but for his cooperation, he might have been indicted for his failure to further report the incident.  (Def.'s SOF ¶ 58; Hatfield Aff., Exh. H., 1/22/98 Trans. 79:23-80:7.)

indicted in January 1996.  (*Id.* at ¶ 21.)  The first trial took place over a nine week period from January to March 1998 and the second trial commenced in March 1998.  Espinosa testified at both trials.  Of the twelve corrections officers indicted, ten were either convicted or plead guilty. (*Id.* at ¶ 24.)

After the first arrests were made in October 1995, plaintiff and the prosecutor's office mutually agreed to remove plaintiff from the jail in order to ensure safety.  (*Id.* at ¶ 17.)  Acting Prosecutor Edward M. Neafsey sent a letter (hereinafter "Neafsey letter")[3] dated October 16, 1995 to Espinosa's attorney, Robert Norton, detailing the prosecutor's office's commitments to plaintiff in exchange for his cooperation.  This letter stated that the prosecutor's office intended that plaintiff would not suffer financially or professionally as a result of his cooperation and contained three promises: (1) assistance in securing employment in Florida, (2) payment of his salary by Union County through the duration of the trials, and (3) payment of up to $15,000 in moving expenses.  (Shea Certif., Exh. P.)  The letter further stated that continued employment with the jail was impossible.  (*Id.*)  Plaintiff claims that various oral promises of continued employment with the County accompanied this written letter, but were not included as this letter would be used for impeachment purposes at trial.  Such oral promises consist of the "possibility of a transfer" to the Auto Task Force, the Narcotics Strike Force, and the Juvenile Detention Center.  (Plaintiff's Brief in Opposition at 40-41.)  At best, these oral representations appear to be gratuitous remarks to look into the possibility of other employment within the County. Additionally, this letter contained a promise to communicate plaintiff's integrity with regard to his participation in the Esmor investigation and trial.  (*See* Neafsey Letter, Shea Certif., Exh. P.)

---

[3] This letter was drafted by Assistant Prosecutor Thomas Isenhour. (Def.'s SOF ¶ 73.)

It, however, does not promise his full personnel file and employment history would be concealed in the event of an inquiry.

 At the conclusion of the trials in May 1998, plaintiff contacted Durkin to discuss further employment with the County, who informed plaintiff to see the director of the jail to explore other law enforcement positions.  Plaintiff chose not to follow Durkin's advice, claiming he feared returning to the jail.  Notably, all other officers that testified during the trial, one of which also wore a wire inside the jail to assist in the investigation, returned to work immediately after testifying.  (Def.'s SOF ¶¶ 85-87.)  While plaintiff was a key witness in the Esmor trials, he was not the sole witness.  Plaintiff, however, did contact County Manager Michael Lapolla on June 3, 1998 to set-up a meeting to discuss certain problems with plaintiff's personnel file.  (*Id.* at SOF ¶ 89.)  On June 9, 1998, plaintiff again spoke with Lapolla regarding his file, at which point plaintiff claims Lapolla advised him that his personnel file would be purged of any derogatory information.  (*Id.* at ¶ 90.)

Around February 1999, plaintiff was offered and accepted a position with the Atlanta Police Department.[4]  (*Id.* at ¶ 96.)  Norton then contacted Lapolla by letter on February 17, 1999 to coordinate a meeting between Lapolla and Espinosa.  (*Id.* at ¶ 97.)  A meeting was scheduled for March 26, 1999, in which plaintiff and Lapolla generally discussed employment options within the County and plaintiff expressed a desire to stay in the same pension system in which he was already enrolled.  (*Id.* at ¶ 101.)  Plaintiff admitted that Lapolla at no point promised him a job; however, claims that Lapolla discussed the possibility of a lump sum settlement and assured

---

[4]Notably, plaintiff requested Lapolla write a letter of recommendation for him to the Atlanta Police Department in September 1998.  (Def.'s SOF ¶ 93.)

plaintiff he would continued to be paid.  (*Id.* at ¶¶ 104;107-108.)  At that meeting, plaintiff informed Lapolla he had received and accepted an offer with the Atlanta Police Department, but was concerned about the low salary.  After the meeting, plaintiff advised the Atlanta Police Department he would not take the job; however, he failed to inform Lapolla that he declined the position.  (*Id.* at ¶ 109.)

In the summer of 2000, Lapolla was informed that plaintiff was still on payroll. Believing plaintiff had taken the Atlanta job, he directed Harold Gibson, the Director of the Department of Public Safety, to send a letter (dated August 2, 2000) to plaintiff requesting he return to the jail on August 14, 2000 or resign.  (*Id.* at ¶¶ 121-122.)  This letter required plaintiff to perform some affirmative action in order to maintain employment with the County.  Instead, plaintiff's attorney at the time, Rafael Betancourt, acknowledged receipt of the August 2, 2000 letter, and sent a letter in response on August 11, 2000 advising that plaintiff would not resign, report to duty or abandon his position.  (*Id.* at ¶ 128.)  At this point, plaintiff had placed defendants in an impossible position, and defendants could have done nothing more than institute termination proceedings.   Plaintiff failed to return to work on August 14, 2000, and received his last paycheck in August 2000.  (*Id.* at ¶ 129.)   The County paid plaintiff his salary for over two years after the conclusion of the trials, which appears to be an oversight on the County's part.

From September 2000 to January 2001, plaintiff was considered by the County on an unpaid leave of absence.  (*Id.* at ¶ 130.)   In January 2001, the County instituted formal disciplinary proceedings.  The County served a preliminary notice of disciplinary charges on January 8, 2001 that contained six separate charges and provided a hearing would be held on January 19, 2001.  (*Id.* at ¶¶ 131-134.)  Norton contacted Frank Capece, County's personnel

counsel, by letter on January 17, 2001 requesting plaintiff be transferred to another position in the County.  (*Id.* at ¶ 135.)  On January 19, 2001, an administrative hearing was held before the Honorable Frederic R. McDaniel.  (*Id.* at ¶ 141.)   After a few requests from plaintiff, a  report and recommendation was issued on March 27, 2001 concluding that plaintiff be terminated effective August 14, 2000 for abandoning his position.  All other charges were dismissed.  (*Id.* at ¶¶ 147-148.)   Lapolla accepted the report and recommendation and a Final Notice of Disciplinary Action was sent to plaintiff on March 27, 2001.  This notice mistakenly contained all six disciplinary charges.  (*Id.* at ¶¶ 147-148.)  The County issued a revised Final Notice of Disciplinary Action containing only the charge of abandonment sixteen months after the original notice was issued.  (*Id.* at ¶ 154.)  Plaintiff filed an appeal to the Merit Systems Board on April 12, 2001, but voluntarily withdrew it on May 13, 2002.  Plaintiff filed this complaint on August 2, 2001.  (*Id.* at ¶¶ 157-159.)


## II) STANDARD OF REVIEW

        Summary judgment eliminates unfounded claims without recourse to a costly and lengthy trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  However, a court should grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The burden of showing that no genuine issue of material fact exists rests initially on the moving party.  *See Celotex*, 477 U.S. at 323.  A litigant may discharge this burden by exposing "the absence of evidence to support the nonmoving party's case."  *Id.* at 325.  In

evaluating a summary judgment motion, a court must view all evidence in the light most favorable to the nonmoving party.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976).

Once the moving party has made a properly supported motion for summary judgment, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The substantive law determines which facts are material.  *Id.* at 248.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*  No issue for trial exists unless the nonmoving party can demonstrate sufficient evidence favoring it such that a reasonable jury could return a verdict in that party's favor.  *See id.* at 249.

## III) DISCUSSION

### A) Section 1983 Claims

In order to maintain a claim under 42 U.S.C. § 1983, plaintiff must first establish he was deprived of a right protected by the Constitution, and then show the individuals who deprived him of that right were acting under the color of state law.  *Salerno v. O'Rourke*, 555 F. Supp. 750, 755 (D.N.J. 1983) (citing *Paul v. Davis*, 424 U.S. 693, (1976); *Reid v. Barrett*, 467 F. Supp. 124, 126 (D.N.J. 1979)).  Plaintiff maintains three claims pursuant to § 1983**:** (1) a violation of substantive due process, (2) a violation of procedural due process, and (3) First Amendment retaliation.  This Court finds that plaintiff has failed to establish he was deprived of a constitutionally protected right under any of these claims.

### (i) Count V– Substantive Due Process Violation/Property Rights

Both plaintiff and defendant moved for summary judgment with regard to a violation of due process.  Plaintiff contends that defendants violated substantive due process through injury to plaintiff's reputation, and procedural due process by terminating plaintiff without providing due pocess.  Defendants argue there is no substantive due process protection for injury to reputation and the procedures provided plaintiff were adequate process.

Defendant's raise and this Court notes that the first time a procedural due process claim was raised was in the plaintiff's brief in support of their motion.  While plaintiff maintains that the complaint contains various due process violations, the Fifth Count of the complaint very specifically refers to "substantive due process" and is devoid of "procedural due process."  That being said, this Court will go forth and address said argument as there has been discovery on the termination procedures and defendants have made an argument addressing the merits of it.

### (a) Substantive Due Process

In the Third Circuit, not all rights that are afforded procedural due process are afforded substantive due process.  *Woodwind Estates, Ltd. v. Gretkowski*, 205 F.3d 118, 123 (3d Cir. 2000).  If the interest is of the like that is protected by the substantive due process clause of the Fourteenth Amendment, "'then substantive due process protects the plaintiff from arbitrary or irrational deprivation regardless of the adequacy of procedures used.'"  *McCullough* v. *City of Atlantic City*, 137 F. Supp.2d 557, 565 (D.N.J. 2001) (quoting *Nicholas v. Pennsylvania State University*, 227 F.3d 133, 139 (3d Cir. 2000)).   Where the matter contains allegations of abusive executive action, it has been held that only the most egregious conduct will be considered arbitrary.  *Boyanski v. Capital Area Intermediate Unit*, 215 F.3d 396, 400 (3d Cir. 2000).

Plaintiff argues a violation of substantive due process as a result of damage to his reputation that occurred during his termination and resulted in the loss of future employment opportunities.  Injury to reputation alone is not an interest protected by the due process clause; rather, plaintiff must claim he suffered some additional deprivation.  *Kelly v. Sayreville*, 107 F.3d 1073, 1077-1078 (3d Cir. 1997).  In order to have a liberty interest in his reputation, plaintiff must establish (1) he was terminated, and (2) charges were sustained against him during his termination that damaged his standing in the community or imposed a stigma such that future employment is precluded.  *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 573 (1972).  Plaintiff maintains that an injury to his reputation occurred during his termination proceedings that resulted in the loss of future employment.

To determine whether plaintiff has a constitutionally protected interest under substantive due process, this Court must next consider whether a genuine issue of material fact exists as to actual damage to plaintiff's reputation.  "For government action to infringe the 'reputation, honor, or integrity' of an individual, that government action first must involve a publication that is substantially and materially false."  *Ersek v. Township of Springfield*, 102 F.3d 79, 83-84 (3d Cir. 1996) (citing *Codd v. Velger*, 429 U.S. 624, 627-29, 51 L. Ed. 2d 92, 97 S. Ct. 882 (1977); *Fraternal Order of Police Lodge No. 5 v. Tucker*, 868 F.2d 74, 82 (3d Cir. 1989)).  Plaintiff must show the "allegedly stigmatizing information was published or otherwise disseminated by his government employer to the public."  *Chabal v. Reagan*, 841 F.2d 1216, 1223 (3d Cir. 1988) (citing *Bishop v. Wood*, 426 U.S. 341, 348 (1976)).  Merely showing that such information is contained within a personnel file is insufficient to demonstrate publication and defeat a motion for summary judgment.  *Copeland v. Phila. Police Dep't*, 840 F.2d 1139, 1148 (3d Cir. 1988).

Additionally, difficulty in finding employment is also insufficient to prove this information has been communicated to others.  *See Chabal*, 841 F.2d at 1223.

Plaintiff has not demonstrated that his personnel file or any of the information resulting from his termination was made public.  He simply claims that false charges appeared in his personnel file, and he had difficulty obtaining employment.  Plaintiff has not shown a government action that involved the publication of substantially false information.  Therefore, no protected substantive due process interest has been established, thus this Court need not determine whether the hearing provided was sufficient.  Summary judgment is granted in favor of the defendants.

### (b) Procedural Due Process

In order to establish a violation of procedural due process pursuant to a dismissal from public employment, it must be shown that: (1) the dismissal deprived plaintiff of a property or liberty interest, and (2) adequate procedural protections were not provided.  *Richardson v. Felix*, 856 F.2d 505, 507 (3d Cir. 1988).  "To have a property interest in a job, a person must have more than a unilateral expectation of continued employment; he must have a legitimate entitlement to it."  *Chabel*, 841 F.2d at 1223.  The property interest must have an independent source of entitlement found in State law.  *McKeever v. Township of Washington*, 236 F. Supp.2d 400, 404 (D.N.J. 2002) (citing *Bishop v. Wood*, 426 U.S. 341, 344 (1976)).  An employee with a protected interest in his employment must be provided a notice of the charges and a hearing prior to being terminated.  *Id.*

Plaintiff maintains that as a tenured official he has a property interest in his employment

as established in N.J.S.A. 40A:14-147, which states in pertinent part:

> no member or officer of the police department or force shall be removed from his office, employment or position for political reasons or for any cause other than incapacity, misconduct, or disobedience of rules and regulations established for the government of the police department and force, nor shall such member or officer be suspended, removed, fined or reduced in rank from or in office, employment, or position therein, except for just cause as hereinbefore provided and then only upon a written complaint setting forth the charge or charges against such member or officer.

It is clear that this statute provides a property interest for members or officers of the police department, and does not include correction officers.  Further, it has been determined that this statute applies to police officers in civil service municipalities who face charges of minor discipline.  *Fraternal Order of Police Lodge No. 1 v. City of Camden Police Dept.*, 845 A.2d 192, 196 (N.J. Super. Ct., Law Div. 2003).  *See also Goodman v. Department of Corrections, Central Reception and Assignment Facility,* 844 A.2d 543, 546 (N.J. Super. Ct., App. Div. 2004) (applying N.J.S.A. 11A:2-13 rather than N.J.S.A. 40A:14-147 because plaintiff was a corrections officer and not a police officer).

However, a review of New Jersey's Civil Service Act, N.J.S.A. 11A:1-1 *et seq.,* evidences a possible vehicle through which plaintiff could be afforded a legitimate property interest in his employment.  It provides that "[b]efore any disciplinary action [] is taken against a *permanent  employee* [] the employee shall be notified in writing and shall have an opportunity for a hearing"  (emphasis added).  *See* N.J.S.A. 11A:2-13.  Thus, employees of permanent status cannot be discharged or demoted without cause and are entitled to a pre-termination hearing and appeal.  *Farber v. City of Patterson*, 327 F. Supp.2d 401, 408 (D.N.J. 2004).  However, employees appointed to their positions provisionally are not afforded these same protections.  *Id.*

Indeed, provisional employees may be terminated at any time at the discretion of the employer. *Id.* (citing *Williams v. Civil Serv. Comm'n*, 329 A.2d 556, 558 (N.J. Sup. Ct. 1974); *Grexa v. State Dept. of Human Serv.*, 402 A.2d 938, 941 (N.J. Super. Ct., App. Div. 1978)).  In order to become a permanent employee, four things must occur: (1) the employee must pass the civil service examination, (2) the employee must be placed on a list of eligible candidates, (3) the Commissioner must certify the three eligible persons who received the highest rankings on the list, and (4) the appointing authority must choose that employee and appoint them permanently to their position.  *Farber*, 327 F. Supp.2d at 409.

Plaintiff has failed to provide this Court with evidence supporting a finding that he is a permanent employee.  While he makes a bare assertion that he was a tenured employee, plaintiff fails to provide evidence to support such an assertion.  Conclusory statements cannot be the basis of evidentiary support for a summary judgment motion.  *See Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990).  More importantly, plaintiff maintains that he was promoted to Sergeant *provisionally*. (Pl.'s SOF ¶ 2.)  Although plaintiff took and passed the civil service examination, plaintiff ranked 34 on the list and did not receive permanent placement and remained a provisional employee.  (Hatfield Aff., Exh. A., Espinosa Dep. 337:3-338:25.)  Therefore, plaintiff had no entitlement to continued employment and is not afforded the protections of procedural due process.

Even if plaintiff had established he has a legitimate property interest in his employment, the procedures afforded by the County comported with the requirements of due process.  Plaintiff was notified of the various charges against him, and then provided a full opportunity to be heard.  Plaintiff argues that the three month lag between his removal from payroll and the notice and

hearing violated his due process rights.  He also contends that the approximate fifty day delay

between the date the report and recommendation should have been issued and was actually issued

was in contravention to N.J.A.C. 4A:2-2.6(d) requiring an issuance of findings within 20 days of

the hearing, and resulted in a violation of procedural due process.  Taking both delays into

consideration, this Court still concludes plaintiff was afforded adequate process.  Regarding

plaintiff's termination hearing, the delay occurred because plaintiff was initially placed on an

unpaid leave of absence in an attempt to avoid formal disciplinary charges, an action in plaintiff's

favor.  Ultimately, plaintiff was provided with notice and a hearing prior to being terminated.  As

to the delay with the issuance of the report and recommendation, this delay was not egregious

and did not result in a violation of due process.  *See Goodman*, 844 A.2d at 546, 548 (noting that

the delay was not egregious and that time limitations with regard to disciplinary hearings were

not intended to be technical impediments to a resolution of charges of misconduct).  Thus,

summary judgment is granted in favor of defendants.

### (ii)  Count IV– First Amendment Retaliation

Again, both plaintiff and defendants filed a motion for summary judgment regarding the

claim of First Amendment retaliation.  "The First Amendment protects statements by public

officials on matters of public concern." *McCullough v. City of Atlantic City*, 137 F. Supp.2d 557,

566 (D.N.J. 2001) (citing *Pickering v. Board of Education of Tp. High School District 205*, 391

U.S. 563, 573 (1968)).  Unlike the Fourteenth Amendment, a First Amendment retaliation claim

is not dependant upon a liberty or property interest. *McCullough*, 137 F. Supp.2d at 566.  A

three-step process is followed in analyzing a claim of retaliation under the First Amendment. *Id.*

First, plaintiff must prove that he engaged in protected speech. *Green v. Philadelphia Hous.*

*Auth.*, 105 F.3d 882, 885 (3d Cir. 1997).  Second, plaintiff must prove the protected activity was

a substantial or motivating factor in the alleged retaliatory action.  *Id.*  Third, the employer can

then rebut plaintiff's claim by demonstrating it would have reached the same decision in the

absence of the protected conduct.  *Brennan v. Norton*, 350 F.3d 399, 414 (3d Cir. 2003).

Defendants do not contest that plaintiff engaged in a protected activity.  Therefore, the crux of

this discussion will be based on whether plaintiff has satisfied his burden of showing the

protected speech was a substantial motivating factor in his termination.

       Plaintiff asserts that it was not safe for him to return to the jail as a result of his

participation and testimony in the Esmor trials, thus defendants' request for his return to work is

a First Amendment retaliation.  Defendants maintain that plaintiff failed to carry his burden of

showing the protected speech was a motivating factor in his termination.  They argue he was

terminated four years after his grand jury testimony and over two years after his trial testimony.

In addition, defendants maintain that Espinosa conceded he would not have been terminated had

he not abandoned his job.  This Court agrees with defendants' position, and finds plaintiff's

argument to be illogical for the following reasons.

       "A public employer 'adversely affects an employee's First Amendment rights when it

refuses to rehire an employee because of the exercise of those rights or when it makes decisions,

which relate to promotion, transfer, recall and hiring, based on the exercise of an employee's

First Amendment rights.'"  *Brennan*, 350 F.3d at 419.  Plaintiff had abandoned his position for a

period over two years prior to being terminated.  Despite plaintiff's agreement with defendants

that he would be paid only through the conclusion of the trials, defendants continued to pay

plaintiff for this entire period.  Further, plaintiff failed to contact defendants regarding other

potential employment in the County until one year after the Esmor trials concluded, at which time he was provided an opportunity to meet with Lapolla.  (Def.'s SOF ¶¶ 97, 100.)  Plaintiff also testified at his deposition that he would not have been terminated had he not abandoned his position and knew he would not get paid forever to stay home.  (*Id.* at ¶¶ 111, 176.)  After two and a half years, plaintiff was requested to either return to work or resign, and when neither was done, defendants terminated plaintiff. (*Id.* at ¶¶ 125-129.)

There is a lack of evidential support that defendants' motives in terminating plaintiff were in retaliation to providing testimony against various corrections officers involved in the Esmor incident.  Indeed, the evidence presented to this Court support a conclusion to the contrary.  It is apparent to this Court that defendants' were not acting in retaliation to plaintiff's testimony, thus summary judgment is granted in favor of defendants.

### B)  Count I– CEPA

Again, both plaintiff and defendant have filed for summary judgment regarding the violation of New Jersey's Conscientious Employee Protection Act (hereinafter "CEPA").  Plaintiff contends that the termination of his employment was clearly in violation of CEPA as a result of his participation in the Esmor investigation and trials.  Defendants contend that plaintiff was terminated as a result of abandonment, thus plaintiff cannot maintain a claim of retaliation.

New Jersey's CEPA statute provides that:

> An employer shall not take any retaliatory action against an employee
> because the employee does any of the following
>
> ***

b. Provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any violation of law, or a rule or regulation promulgated pursuant to law by the employer or another employer with whom there is a business relationship; or

c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:

\*\*\*

(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

N.J.S.A. 3:19-3.  CEPA is a remedial statute that should be construed liberally to achieve its remedial purpose.  *McCullough*, 137 F. Supp.2d at 572-573.  Plaintiff argues a CEPA violation pursuant to two theories: (1) defendants retaliated against plaintiff for his testimony in the Esmor trials by terminating plaintiff when it was unsafe for him to return to the jail, N.J.S.A. 3:19-3b; and (2) defendants retaliated against plaintiff when terminating him for refusing to return to work because he believed the unsafe work environment was in violation of public policy, N.J.S.A. 3:19-3c.  Both claims are analyzed the same under CEPA, thus they will be discussed together. *Costello v. City of Brigantine*, 2001 U.S. Dist. LEXIS 8687, \*31 (D.N.J. 2001).

In order to establish a claim of CEPA, plaintiff must make out a *prima facie* case of retaliatory action.  *McCullough*, 137 F. Supp.2d at 573.  To satisfy this burden, plaintiff must show that: (1) he believed his employer's conduct violated either a law, or rule or regulation; (2) he either (a) disclosed or threatened to disclose the activity, or (b) objected to or refused to participate in the activity; (3) retaliatory action was taken against him; and (4) a causal connection between the whistle-blowing activity and the adverse employment action.  *Costello*, 2001 U.S. Dist. LEXIS 8687 at \*31.  Once plaintiff meets the *prima facie* burden, defendant must articulate a legitimate, nondiscriminatory reason for making the adverse employment

decision. *McCullough*, 137 F. Supp.2d at 573.  The burden then shifts back to plaintiff to raise

an issue of fact as to whether defendant's explanation is pretextual or whether retaliatory

discrimination was more likely than not a determinative factor in the decision. *Id.*  "The

employee need not submit direct evidence of discrimination, but must only raise a genuine issue

of fact suggesting pretext by providing some evidence establishing a reasonable inference that the

employer's proffered reason for the decision was weak, implausible, inconsistent, incoherent or

contradictory so as to be unworthy of credence." *Id.* (citing *Bowles v. City of Camden*, 993 F.

Supp. 255, 262 (D.N.J. 1998).

Defendants argue that plaintiff failed to causally connect the whistle-blowing activity to

the termination, thus he has not made out a *prima facie* case of CEPA.[5]  Specifically, defendants

argue that causation is lacking as over two years have lapsed between the testimony and the

termination. Additionally, defendants contend that plaintiff was terminated as a result of

abandoning his position.  This Court agrees that plaintiff has failed to make out a *prima facie*

case of CEPA.

Plaintiff contends that defendants' order for plaintiff to resign or return to the jail when

they knew plaintiff would never return was an act in retaliation to plaintiff testifying.  In addition,

plaintiff argues that termination for his refusal to return to work because he believed the unsafe

work environment was in violation of public policy is retaliatory conduct in violation of CEPA.

As already noted by this Court, these arguments are illogical.  The various facts of this case do

---

[5]Defendants initially contend that plaintiff's testimony is not protected under CEPA because he testified about the conduct of a co-worker.  However, CEPA protects against retaliation for disclosure of a co-worker's action. *DeLisa v. County of Bergen*, 755 A.2d 578, 582 (N.J. Sup. Ct. 2000).

not sustain the causal connection required to maintain a CEPA cause of action.  As noted in the

First Amendment section, *infra*, plaintiff had abandoned his position for a period over two years,

for which he was paid.  Further, after this time had lapsed, defendants requested plaintiff return

to his position or resign.  Plaintiff having done neither, defendants terminated plaintiff.  It is

rather clear to this Court that plaintiff was terminated for abandoning his position and not in

retaliation for his testimony.  For a more complete discussion, see Section (A)(ii) *infra* discussing

First Amendment retaliation.


### C) Count II–Aiding and Abetting a Violation of CEPA

Defendants also argue summary judgment as to the aiding and abetting claim should be

granted because there is no such cause of action.  Plaintiff maintains this is a valid cause of

action because New Jersey's Law Against Discrimination (hereinafter "LAD") is the basis of the

legal framework for CEPA, and LAD provides a cause of action for aiding and abetting.  *Failla

v. Passaic*, 146 F.3d 149, 158 (3d Cir. 1998).

However, LAD is distinguishable from CEPA in that individual liability for a LAD claim

must be predicated on aiding and abetting, otherwise there is no claim against an individual.

*Kennedy v. Chubb Group of Ins. Cos.*, 60 F. Supp.2d 384, 390 (D.N.J. 1999) (citing *Hurley v.

Atlantic City Police Dep't.,* 174 F.3d 95, 125 (3d Cir. 1999)).  Conversely, CEPA creates a cause

of action against individual defendants.  *Espinosa v. Continental Airlines*, 80 F. Supp.2d 297,

305 (D.N.J. 2000).  Further, it has been determined that while LAD does create a separate cause

of action for aiding and abetting, CEPA is not similarly written and creates its own separate

cause of action to hold individuals liable.  *Id.*  Plaintiff has failed to provide any legal authority

creating a claim for aiding and abetting, thus summary judgment is granted.

### D) Counts Subsumed Under CEPA

Defendants next seek summary judgment for five of plaintiff's state law claims based

upon CEPA's waiver provision.  For some of these claims, defendants also provide alternative

theories upon which they assert summary judgment should be granted.  Additionally, plaintiff

seeks summary judgment for the breach of contract claim as well.  All arguments pursuant to

these claims will be discussed in this section.

Under the CEPA waiver provision, "the institution of an action in accordance with this

act shall be deemed a waiver of the rights and remedies available under any other contract,

collective bargaining agreement, State law, rule or regulation or under the common law."

N.J.S.A. 34:19-8.  Defendants allege plaintiff's institution of his CEPA claim results in the

following counts being waived: (1) Count III alleging constructive discharge; (2) Count VI

alleging a state constitutional tort for violation of freedom of speech and injury to reputation; (3)

Count VII alleging breach of contract and the implied covenant of fair dealing; (4) Count VIII

alleging violation of New Jersey public policy; and, (5) Count X alleging intentional infliction of

emotional distress.   Plaintiff concedes that both his state constitutional tort claim regarding

freedom of speech and his New Jersey Public Policy claim are waived under the CEPA waiver

provision, thus these claims will not be discussed any further herein.

"The unambiguous language of the New Jersey provision indicates that by filing a claim

under CEPA, a plaintiff waives his or her right to assert claims for the same conduct."

*Palladino ex rel. United States v. VNA of S. N.J., Inc.*, 68 F. Supp. 2d 455, 470 (D.N.J. 1999).

The waiver provision applies to claims that are "substantially related" to the CEPA claim.

*Bowen v. Parking Auth. of Camden*, 2003 U.S. Dist. LEXIS 16305, at *87 (D.N.J. 2003) (citing

*Young v. Schering Corp.*, 275 N.J. Super. 221, 238, 645 A.2d 1238 (App. Div. 1994), *aff'd*, 141

N.J. 16, 31, 660 A.2d 1153 (1995)).  It includes all rights and remedies that are available when an

employee is wrongfully discharged for disclosure, in an attempt to prevent multiple claims based

upon the same issue.  *Young*, 141 N.J. at 29-30.  Conversely, claims that do not require a

showing of retaliation and require a showing of different proofs are not waived by the institution

of the CEPA claim.  *Kadetsky v. Egg Harbor Twp. Bd. of Educ.*, 82 F. Supp. 2d 327, 342 (D.N.J.

2000) (citing *Young*, 141 N.J. at 32).  The waiver provision applies to claims upon the institution

of a CEPA claim, therefore a claim will not be saved merely because a court dismisses the

underlying CEPA claim.  *Lynch v. New Deal Delivery Serv.*, 974 F. Supp. 441, 456 (D.N.J. 1997)

(citing *Flaherty v. The Enclave*, 255 N.J. Super. 407, 414, 605 A.2d 301 (Law. Div. 1992)).

### (i)   Count III–Constructive Discharge Claim

Defendants argue that summary judgment should be granted as to the constructive

discharge claim because it is waived under CEPA, or alternatively the claim should be dismissed

because Plaintiff did not resign from his position.  Plaintiff alleges defendants constructively

discharged him by requiring him to work in a dangerous work environment, refusing to transfer

him, and bringing disciplinary charges resulting in his termination when he refused to return.

Plaintiff's constructive discharge claim is waived because this claim is substantially similar to

plaintiff's CEPA claim as both are based upon the same facts regarding the work environment of

the jail.[6]   Thus, this claim is not factually independent of the CEPA claim and is waived.

### (ii) Count VI–State Constitutional Tort/Violation of Freedom of Speech

Defendants next argue summary judgment should be granted as to the violation of the New Jersey Constitution for injury to plaintiff's reputation because it is waived under CEPA, and alternatively plaintiff received adequate due process.  In addition to the freedom of speech claim, plaintiff asserts a state constitutional tort claim that includes a claim for injury to his reputation.  As previously noted, the freedom of speech claim was voluntarily dismissed; therefore, this discussion will focus on his reputation argument.  This claim is not waived under CEPA because it contains an analysis of facts independent of the retaliation claim since this alleged injury occurred after the retaliatory events, thus it will be discussed under defendant's alternative argument.

The analysis of injury to reputation under the New Jersey Constitution differs from that under the Federal Constitution only to the extent that an injury to one's reputation is protected without requiring any other tangible property loss.  *Doe v. Poritz*, 642 A.2d 367, 419 (N.J. Sup. Ct. 1995).  This Court dismisses plaintiff's state constitutional claim pursuant to injury to reputation for the same reasons as set forth in the substantive due process analysis.  As this Court held there, plaintiff has failed to show a government action resulting in the publication of substantially false information.  Because plaintiff has not carried this burden, this Court need not

---

[6]Even if it was not waived by CEPA, plaintiff still cannot maintain this claim because defendants admittedly terminated plaintiff for abandoning his position, thus plaintiff did not resign.  *See Jordan v. City of Gary*, 396 F.3d 825, 837 (7th Cir. 2005)  (citing *McPherson v. City of Waukegan*, 379 F.3d 430, 440 (7th Cir. 2004) ("We can make it no plainer than to reiterate that constructive discharge "'refers to a situation in which an employee is not fired but quits.'")).

reach the sufficing nature of the hearing provided by defendants  Since this analysis is identical to the analysis under the Fourteenth Amendment, see the discussion in Section (A)(i)(a)  *infra* denying Plaintiff's federal substantive due process claim.

### (iii) Count VII–Breach of Contract and the Implied Covenants of Good Faith and Fair Dealing

Both defendants and plaintiff contend summary judgment should be granted in their favor as to the breach of contract and the breach of the implied covenants of good faith and fair dealing.  Plaintiff's claim is based upon violations of the Collective Bargaining Agreement that is in place between the County of Union and the Policemen's Benevolent Association Union County Corrections Local #199, Inc.  Plaintiff asserts summary judgment should be granted because defendants committed a breach of contract and a breach of the implied covenant of good faith and fair dealing when they terminated him for refusing to return to the jail.  Defendants argue summary judgment is appropriate because plaintiff's claim is barred by the waiver provision in CEPA, or alternatively plaintiff is precluded from bringing the claim since he did not exhaust administrative remedies.

Plaintiff's breach of contract claim is based on termination without just cause and an unsafe work environment, both of which require the provision of evidence identical to that needed to prove retaliation under CEPA.  *See Bowen*, 2003 U.S. Dist. LEXIS at *138.  Thus, these claims are substantially related and summary judgment is granted in favor of defendant.

### (iv) Count X–Intentional Infliction of Emotional Distress Claim

Defendants also assert summary judgment should be granted as to intentional infliction of

emotional distress pursuant to the CEPA waiver provision, or alternatively because plaintiff's allegations do not constitute "severe emotional distress" and defendant's conduct does not rise to the level of "outrageous conduct."  Plaintiff claims his emotional distress was caused by defendants retaliating against him and threatening him and his family with bodily harm and death, demanding he return to a dangerous work environment, refusing to transfer him, filing disciplinary charges against him, terminating his employment, and refusing to remove certain disciplinary charges from his personnel file.

Plaintiff's allegations regarding all conduct occurring up to and including terminating his employment require a showing of the very "same conduct" plaintiff's CEPA claim is based upon. *See Palladino*, 68 F. Supp. 2d at 470 (D.N.J. 1999).  When an emotional distress claim is linked to plaintiff's termination, it is waived under CEPA.  *See Lynch*, 974 F. Supp. 441, 456 (D.N.J. 1997).  Thus, these claims are dismissed as waived.  However, the refusal to remove disciplinary charges from his file is distinct conduct that is not waived by the CEPA claim; therefore, defendants' alternative argument will be discussed.

To establish a claim for intentional infliction of emotional distress under New Jersey law, plaintiff must show there was "intentional and outrageous conduct by the defendant, proximate cause, and distress that [was] severe."  *Buckley v. Trenton Sav. Fund Soc'y*, 544 A.2d 857, 863 (N.J. Sup. Ct. 1988).  For conduct to qualify as outrageous, it must "'go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"  *Id.* (citing Restate (Second) of Torts § 46).  "This tort 'tolerates many kinds of unjust, unfair and unkind conduct,' and it is 'extremely rare to find conduct in the employment context which will rise to the level of outrageousness necessary to provide a basis for recovery.'"

*Mosley v. Del. River Port Auth.*, 2000 U.S. Dist. LEXIS 22402 (D.N.J. 2000) (citing *Fregara v. Jet Aviation Business Jets*, 764 F. Supp. 940, 956 (D.N.J. 1991)). Courts routinely hold that claims involving employment decisions do not as a matter of law state a claim for intentional infliction of emotional distress. *Witherspoon v. Rent-A-Center, Inc.*, 173 F. Supp. 2d 239, 242 (D.N.J. 2001).

Plaintiff's intentional infliction of emotional distress claim cannot be sustained under the allegation that defendants failed to remove the disciplinary charges since this does not amount to outrageous conduct. The failure to amend a person's personnel record is not "utterly intolerable in a civilized community." *Buckley,* 544 A.2d at 863. Therefore, defendants' conduct was not "outrageous" and summary judgment is granted.

### E) Count XII–Fraud

Defendants claim summary judgment should be granted as to plaintiff's fraud claim because plaintiff has offered no evidence to show that he was promised continued employment with Union County. Plaintiff claims that the defendants[7] committed fraud and induced his continued assistance by making false representations regarding their intention to provide plaintiff with alternate employment with the County following the completion of the Esmor prosecutions. To assert a claim of fraud under New Jersey law, a plaintiff must show "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by defendant of its falsity; (3) an intention that the plaintiff rely on it; (4) reasonable reliance by the plaintiff; and (5) resulting damages." *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 367 (N.J. Sup. Ct. 1997).

_____

[7]Plaintiff waives the fraud claim against defendants Coleman, Gibson, and Dougherty.

Federal Rule of Civil Procedure 9(b) requires that all averments of fraud or mistake be stated with particularity. *See, e.g., GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 236 (3d Cir. 2004). Furthermore, a plaintiff must establish a claim of fraud by clear and convincing evidence. *New Jersey Economic Dev. Auth. v. Pavonia Restaurant*, 725 A.2d 1133, 1139 (N.J. Super. Ct., App. Div. 1998) (citation omitted). Plaintiff alleges two theories of fraud claiming defendants made both oral and written misrepresentations.

With respect to the assertion of oral fraud, plaintiff argues that defendants fraudulently induced his continued cooperation with the prosecutor's office with unfulfilled oral promises of continued employment with Union County. He claims that such oral promises were not contained in the Neafsey letter because the letter would be used to impeach plaintiff's credibility at trial. Defendant Isenhour confirmed that the Neafsey letter, which he had authored, was likely to be used against plaintiff at trial. However, Isenhour claimed that this knowledge caused him to add "fluff" about plaintiff and to leave out what he considered to be the true "benefit" to plaintiff, namely an agreement not to criminally prosecute the plaintiff. (Shea Certif., Exh. G, Isenhour Dep. 74:6-75:17.) Isenhour at no point testified that future job opportunities with the County were promised but not contained in the letter.[8] Even taking these oral statements into consideration, plaintiff fails to allege a misrepresentation which is a fatal flaw in his fraud allegation.

Plaintiff's reference to assurances that he would not be harmed fall well short of a representation that he would continue to have a job in Union County. Plaintiff relies on such

---

[8]Notably, plaintiff claims that he was "satisfied" with the content of the letter, and no one ever told him that the letter was anything but the "real deal." (Hatfield Aff., Exh. A, Espinosa Dep. 99:4-25.)

statements that plaintiff "might be assigned to the Auto Task Force" or that he "could be transferred" to the Auto Task Force or the Narcotics Strike Force.  These statements do not remotely provide for guaranteed employment with the County, thus even if these statements were made there is no material representation.  As already noted, these representations appear to be nothing more than gratuitous remarks to look into the possibility of another position within the County.  Plaintiff even testified at the 1998 Esmor trial and again during his January 2004 deposition that he had not been promised a position with Union County.  (Hatfield Aff., Exh. H, 1/22/98 Trans. 73:19-22; Exh A, Espinosa Dep. 371:23-372:4.)

Furthermore, some of the statements plaintiff claims induced him to continue assisting in the Esmor prosecutions actually occurred after the prosecutions were completed.  The Esmor trials concluded in April 1998, and the last defendants were sentenced in May of that same year.  Despite this fact, plaintiff claims that he relied on statements allegedly made during a March 1999 meeting with defendant Lapolla.  These statements clearly could not have induced plaintiff to continue assisting in a prosecution that had already been completed.  Thus, the record is devoid of any evidence supporting a finding of fraud with regard to the oral statements.

In addition to the claim of fraud regarding oral promises, plaintiff apparently claims that fraud occurred with respect to the written promises contained in the Neafsey Letter.  Although there was no mention of fraud in this regard in the complaint, plaintiff addresses it at length in his opposition brief.  It appears as though this claim of fraud is not properly before the Court as it was not been appropriately alleged in the complaint pursuant to Fed. R. of Civ. P. 9(b), which requires all averments of fraud be stated with particularity.

Even if the written fraud claim was properly alleged, plaintiff has not shown sufficient

evidence for the claim to survive the instant motion for summary judgment.  To reiterate, the Neafsey letter promised to provide plaintiff with assistance in finding a job in Florida, including a willingness to positively recommend plaintiff to other law enforcement agencies and to contact "high ranking government officials, " and to reimburse plaintiff up to $15,000 in relocation expenses.  Plaintiff has presented no evidence that he requested and defendant refused to provide said assistance.  Although a 1996 record of the Miami Dade Police Department shows that defendant Durkin commented that plaintiff had a "[l]ong history of continuous violations of employment rules," plaintiff has admitted that he received numerous reprimands and three suspensions over the course of his employment with Union County.  (Def.'s SOF ¶¶ 29, 165(1)(C); Shea Certif. Exh. EEE.)  The Neafsey letter provides a promise to attest to plaintiff's integrity during the Esmor trials and nowhere promises to conceal plaintiff's entire personnel record and employment history upon inquiry.  Additionally, there is evidence of Union County's entirely positive evaluation of plaintiff's employment history in a verification form and an employment questionnaire from Miami Dade Corrections, both of which were completed by defendant Dougherty.

In regard to the $15,000 for moving expenses, there is no evidence in the record that plaintiff asked for and was refused reimbursement for moving expenses.  Although plaintiff did speak to Durkin about reimbursement, Durkin explained that plaintiff must obtain quotes and then return with an actual figure.  Nothing in the record supports a conclusion that plaintiff returned with a quote and was refused.  Additionally, plaintiff testified himself that he was not sure if his attorney ever actually requested a reimbursement of the moving expenses.  (Hatfield Aff., Exh. A, Espinosa Dep. 181:11-14.)  Further, defendant was paid, despite the agreement, by

the County for over two years after his assistance with the Esmor prosecutions without having to work, a figure that more than covers the $15,000 moving expenses.

Despite plaintiff's assertion that there is "clear and convincing evidence that [the written and oral] assurances were known to be false at the time they were made," no evidence has been offered to support this allegation.  Thus, defendants' motion for summary judgment is granted.

### F) Count XI–Defamation

Defendants also seek summary judgment on the defamation claim, arguing that plaintiff has put forth no proof that the allegedly defamatory statements were ever published.  Plaintiff alleges that the disciplinary charges placed in his file with Union County are false, and that the defendants defamed him by publishing his file to potential employers.  Alternately, plaintiff seeks to invoke the "compelled self-publication" doctrine, as he claims that he was and is forced to publish the allegedly false information to potential employers himself.

"A defamatory statement is one that is false and 'injurious to the reputation of another' or exposes another person to 'hatred, contempt or ridicule' or subjects another person to 'a loss of the good will and confidence' in which he or she is held by others." *Romaine v. Kallinger*, 537 A.2d 284, 287 (N.J. Sup. Ct. 1988) (citations omitted).  To establish a claim of defamation under New Jersey law, a plaintiff must show that the defendant: "(1) made a defamatory statement of fact; (2) concerning the plaintiff; (3) which was false; and (4) which was communicated to a person or persons other than the plaintiff." *Beck v. Tribert*, 711 A.2d 951, 958-959 (N.J. Super. Ct., App. Div. 1998).  Plaintiff claims that defendants published the allegedly defamatory statements from plaintiff's personnel file to prospective employers, causing him to lose job

opportunities with Miami Dade County Corrections and Broward County during 2001 and 2002.

Plaintiff provides no evidence to support his conclusion that defendants' publication of his personnel file was the reason for his lost job opportunities, thus defendant's summary judgment motion must be granted.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (noting that the party moving for summary judgment has the burden of showing that no genuine issue of material fact exists, and this burden may be discharged by exposing "the absence of evidence to support the nonmoving party's case.")  In fact, plaintiff notes that neither Miami Dade County Corrections nor Broward County explained to him the reason why he was not hired.

Plaintiff notes that Durkin was contacted by the Miami Dade Police Department for information about plaintiff and alleges that Durkin characterized plaintiff as having a "[l]ong history of continuous violations of employment rules," which was recorded in a 1996 applicant evaluation worksheet.  Durkin denies saying anything derogatory, and claims that he referred the request for personnel information to the County since the plaintiff was an employee of the Department of Corrections and not the prosecutor's office.  Even if these statements were made, plaintiff admits that he received numerous reprimands and three suspensions over the course of his employment with Union County.   (Def.'s SOF ¶¶ 29, 165(1)(C); Shea Certif. Exh. EEE.)  Thus, any statements made by Durkin were truthful, and the truth of a statement is a complete defense to a defamation action.  *McLaughlin v. Rosanio, Bailets & Talamo, Inc.*, 751 A.2d 1066, 1071 (N.J. Super. Ct., App. Div. 2000) (citation omitted).

Plaintiff further argues that the publication requirement for his defamation claim is supported under the doctrine of "compelled self-publication," as he was and will continue to be compelled to provide allegedly false and defamatory information to prospective employers as

part of the employment application process.  In the Court's opinion, the only case cited by

plaintiff is not authority for the notion that compelled self-publication satisfies the publication

requirement in a defamation action.  *See Monroe v. Host Marriott Services Corp.*, 999 F. Supp.

599, 604 (D.N.J. 1998).  In fact, the cases cited in *Monroe* actually stand for the proposition that

compelled self-publication is not the rule in many districts within the Third Circuit.  *See Lynch v.

Mellon Bank of Del.*, 1992 Del. Super. LEXIS 551, *3 (Del. Super. March 12, 1992) ("Although

the concept of self-publication has been accepted in a minority of other jurisdictions, it is not the

law in Delaware."); *DiPietro v. Jefferson Bank*, 1993 U.S. Dist. LEXIS 4047, *1 (E.D. Pa. April

1, 1993) ("Pennsylvania does not recognize a cause of action for defamation based on self-

publication.")  Plaintiff has not provided this Court with any authority for the proposition that

compelled self-publication is the law in New Jersey.  Therefore, this doctrine does not satisfy the

publication requirement and summary judgment is granted.


### G) Count IX–Tortious Interference with Prospective Economic Advantage

Defendants also seek summary judgment of the tortious interference with a prospective

economic advantage claim arguing plaintiff has put forth no evidence supporting a conclusion

that defendants interfered with plaintiff's prospective employment opportunities.  Plaintiff claims

that the defendants tortiously interfered with his prospective economic advantage by terminating

his employment with the County and maintaining false disciplinary charges in his employment

file for over a year.  The loss of prospective economic advantage claim is with respect to

plaintiff's continued employment with the County, as well as prospective employment

opportunities elsewhere.

New Jersey has long recognized a cause of action for interference with one's prospective economic advantage.  *Starting Nine, Inc. v. Highgate Prods., Inc.*, 1993 U.S. Dist. LEXIS 8593 (D.N.J. 1993).  The four elements necessary to establish a *prima facie* case for tortious interference with prospective economic advantage include:  (1) the existence of a protectable right, such as a prospective economic relationship; (2) intentional and malicious interference by the defendant; (3) the loss of a prospective gain caused by the interference; and (4) damage. *Printing Mart-Morristown v. Sharp Electronics Corp.*, 563 A.2d 31, 37 (N.J. Sup. Ct. 1989). The protectable right need not equate with an enforceable contract, but there must be a "reasonable expectation of economic advantage."  *Id.*  Further, the standard for malicious interference "must be flexible and must focus on a defendant's actions in the context of the case presented."  *Id.* at 40.

Plaintiff claims that his disciplinary record containing false charges had a negative impact on his job search.  However, much like the defamation claim, plaintiff provides no specific evidence to support his claim that his disciplinary record had a negative impact on any job opportunity.  Plaintiff notes that several prospective employers did not explain to him the reason why he was not hired.  This allegation is nothing more than mere speculation, as previously discussed at length.

Plaintiff further claims that the defendants' interference caused him to lose employment with Union County.  "It is fundamental to a cause of action for tortious interference with a prospective economic relationship that the claim be directed against defendants who are not parties to the relationship."  *Printing Mart-Morristown*, 563 A.2d. at 37 (citations omitted).  The County defendants in this case were parties to the economic relationship, and thus the claim

cannot go forward.  Since plaintiff has produced no evidence in support of the claim that the County's interference caused him to lose a prospective economic gain, the defendants' motion for summary judgment is granted.

### H)  Defendants' Counterclaims

Defendants have filed three counterclaims, including a breach of the implied covenant of good faith and fair dealing, conversion, and unjust enrichment.  Plaintiff moves for summary judgment on all three of these claims.

### (i) Counterclaim I–Implied Covenant of Good Faith and Fair Dealing

Plaintiff argues there was no valid enforceable contract between the County and plaintiff limiting his employment rights, therefore a breach of the implied covenant of good faith and fair dealing could not exist and summary judgment should be granted.  Defendants assert a claim for breach of the implied covenant of good faith and fair dealing as a result of plaintiff accepting pay for over two years after the trial was concluded.  Defendants argue there was an express and/or implied agreement that plaintiff would testify in exchange for continued receipt of his salary and benefits through the end of the trial, although he would not actually be working.

Every contract made under New Jersey law contains an implied covenant of good faith and fair dealing.  *Fields v. Thompson Printing Co.*, 363 F.3d 259, 270 (3d Cir. 2004).   Under the covenant, neither party can do anything that will result in "destroying or injuring the right of the other party to receive the fruits of the contract."  *Id.*  In order to prove a claim for breach of the implied covenant of good faith and fair dealing, it is important to demonstrate a state of mind that is dishonest or contains "bad motive."  *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1129

(N.J. Sup. Ct. 2001).

While the Neafsey letter does appear to be an agreement between plaintiff and defendants, the Court need not go into a complex contract analysis since the facts are insufficient to support a breach of the implied covenant of good faith and fair dealing. The defendants did receive the "fruits of the contract" since plaintiff testified as promised. *See Fields*, 363 F.3d at 270. Additionally, plaintiff's actions do not demonstrate that he was acting dishonestly or with a "bad motive," as he did not underhandedly continue to collect his salary or retain it in defiance of requests for its return. *See Wilson*, 168 N.J. at 249. Neither of the persons involved in creating this "contract," Durkin or Isenhour, had any expectation plaintiff would return to the jail at the close of the trial and both were under the impression plaintiff was moving to Florida. (Shea Certif., Exh. G, Isenhour Dep. 72:8-23; Exh. D, Durkin Dep. 116:4-11.)

The County's Finance Department, as well as the jail directors, were also fully aware the County continued to  pay plaintiff after the conclusion of the trial in 1998 until 2000. (Pl.'s SOF ¶¶ 125, 129.) Lapolla, then Union County Manager, testified that he knew in February 1999 that Plaintiff was still receiving payment. (*Id.* at ¶ 124.) Despite this knowledge, Lapolla, as well as several other individuals employed by the County, testified that no one ever requested plaintiff return this money. (*Id.* at ¶¶ 130-134.) Furthermore, the newly appointed assistant director of the jail, Dougherty, was told by personnel technician Filomena Karabinchak that plaintiff should remain on payroll "until further notice." (Shea Certif., Exh. C, Dougherty Dep. 26:3-27:15, 46:7-12.) Karabinchak and Dougherty discussed plaintiff's pay "numerous times," but Dougherty testified he was following orders that were in place before he began work at the jail. (*Id.* at 26:21-24.) Thus, it is apparent that there are no facts to support defendants' claim that plaintiff

Page 33 of  36

breached the implied covenant of good faith and fair dealing and summary judgment is granted.

### (ii) Counterclaim II–Conversion

Plaintiff next asserts that summary judgment should be granted as to defendants' claim for conversion since the County never requested plaintiff return the salary payments.  Defendants filed a claim for conversion arguing plaintiff "wrongfully seized" $114,732.08 since plaintiff knew he had no right to retain this money because he was not working.

Under New Jersey law, conversion is "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Philadelphia Reserve Supply Co. v. Nowalk & Assocs.*, 1995 U.S. Dist. LEXIS 9723, *36 (E.D. Pa. 1995) (citing *Slowinski v. Valley National Bank*, 264 N.J. Super. 172, 624 A.2d 85, 94 (1993)).  In the event possession is lawfully acquired, there must be a refusal to deliver on demand to evidence conversion.  *Id.* (citing *Mueller v. Technical Devices Corp.*, 8 N.J. 201, 207 A.2d 620, 623 (1951)) (quoting *Farrow v. Ocean County Trust Co.*, 121 N.J.L. 344, 2 A.2d 352 (1938)).  Burden of proof of a demand and a denial rests with the claimant.  *Mueller v. Technical Devices Corp.*, 84 A.2d 620, 623 (N.J. Sup. Ct. 1951).

Plaintiff's salary and benefits were lawfully acquired.  He did not use any illegal methods to obtain the funds, rather the County knowingly continued to send him his salary payments. Since he obtained the money lawfully, defendants have the burden of demonstrating a demand for the return of the money and a refusal of said demand.  Although defendants assert they have made such a demand, they present no evidence supporting this general allegation and plaintiff

instead presents evidence to show there have been no such requests.  Plaintiff points to

deposition testimony from Lapolla admitting that the County had not demanded plaintiff return

any salary or benefits, as well as admissions from several other County employees corroborating

this testimony.  (*See* Pl.'s SOF ¶¶ 130-134.)  Therefore, there are insufficient facts to support

defendant's claim of conversion and summary judgment is granted.

### (iii) Counterclaim III–Unjust Enrichment

Finally, plaintiff contends summary judgment should be granted as to defendant's claim

of unjust enrichment because plaintiff remained a tenured employee, the County was aware he

was receiving salary payments, and the County never requested return of these monies.

Defendants' claim plaintiff's retention of his salary after the conclusion of the trial constituted

unjust enrichment and is contrary to public policy since it is at the taxpayers' expense.

To establish a claim for unjust enrichment, the claimant must show that the defendant

received a benefit and retention of that benefit would be unjust.  *VRG Corp. v. GKN Realty*

*Corp.*, 641 A.2d 519, 527 (N.J. Sup. Ct. 1994).  Claimant must also demonstrate that at the time

the benefit was conferred he expected remuneration from the benefitted party and the failure of

remuneration enriched that party beyond their contractual rights.  *Id.*

Defendants have not presented any facts that demonstrate they expected remuneration

from plaintiff.  The County knowingly continued to pay plaintiff his salary, yet plaintiff had

expressed to defendants he did not want to return to work.  (Pl.'s SOF  ¶¶ 124-125, 129.)

Further, defendants did not expect plaintiff to return to the jail after the conclusion of the trial.

(Shea Certif., Exh. G, Isenhour Dep. 72:8-23; Exh. D, Durkin Dep. 116:4-11.)   Plaintiff met

with Durkin after the trial and met with Lapolla a year later to discuss his employment situation

with the County.  Despite these meetings, defendants did not request plaintiff perform other work within the County in return for his salary.  Since the facts do not show there was any expectation of remuneration from plaintiff, there cannot be a claim for unjust enrichment and summary judgment is granted.

## IV) CONCLUSION

In conclusion, the complaint and counterclaims are **DISMISSED** in their entirety.  An order will be issued in conjunction with this opinion.

**Dated:** 8/30/05                                    **s/William J. Martini**

                                                      _____

                                                      **WILLIAM J. MARTINI, U.S.D.J.**